Madam Clerk, please call the next case. C-13-169 Town & Country District v. Ruth Williamson Counsel, you may proceed. Good morning, Your Honors. Mr. Kozin. Daniel Egan on behalf of the employer Town & Country Distributors. Before I begin, I've argued in front of this panel several dozen times over the past 20 years. This is the first time that I have appeared in this Court since Justice McCulloh's passing, and I would like to extend my condolences. I welcome Mr. Justice Harris. I look forward to debating with you in the future, as I do with all of you. And that said, after the last argument — Do people actually enjoy debating with me? Of course. It's not a pleasurable experience, I'm sure. Sometimes it is not, but sometimes it is. And after the last case, I don't know that I'm all that anxious to be up in front of Your Honors. I have a difficult task in front of me this morning. I am here to persuade Your Honors that the Commission decision in this matter is against the manifest weight of the evidence and should be reversed. I believe the Commission's conclusion that the accident of September 23, 2010, aggravated an underlying condition to the point of requiring a three-level cervical fusion, is against the manifest weight of the evidence. The award of temporary total disability benefits after February 28, 2011, for a brief period of about one month, is also against the manifest weight of the evidence. And, of course, the award for future medical in the form of said three-level fusion is also against the manifest weight of the evidence. The employer doesn't dispute that Petitioner sustained a cervical strain on September 23, 2010, in the course of his employment. However, if you look at this man's long history of cervical complaints, including a recommendation for a two-level fusion at the same levels that we are discussing today, and his previous neurosurgeons urging that he have this surgery on a semi-emergent basis or risk becoming a quadriplegic back in, I think, 2001, 2002. Let me see if we can hone in on what really is the crux of the issue here that you started to allude to. This is a case in which the theory of recovery, backed up by Dr. Zinderich's testimony, is that, yes, the claimant had a history, pre-existing history, of problems in the neck and the back. However, he was basically working, performing all of his duties until September 23, 2010. Zinderich says his condition of well-being is an aggravation of his disc disease, resulting from the trauma on September 23, 2010. You've got the claimant not missing any amount of work until that point. You've got, basically, you've got some evidence, the EMG provides some objective evidence, that the condition was chained by the work accident. And you sort of have a battle of experts. So how is that against the manifest ways? Well, because the opinions of Dr. Kornblatt, the employer's examining physician, he's the only one that had all of the medical records. If you look at Dr. Zinderich's testimony, I don't believe he had the chiropractic records, which show that this gentleman continued to have cervical complaints. The records are very difficult to read. But in 2008, he's describing how his neck is bad, I think the word is, and it's always bad. What is confounding is that after the commission, back in 2001, said you don't need surgery under the compact, he, again, went back to work and did his normal job until he had a cervical strain. And the diagnostics, the MRI, Your Honor, after the most recent accident is unchanged when compared to the prior MRIs. So an aggravation, there's no change. I think there may have been an exacerbation. And the employer doesn't dispute that. They paid roughly six months of temporary total disability. They paid medical through March of 2011. Dr. Kornblatt reviewed all the records and concluded that he was back at his baseline. And Dr. Zinderich's only basis for surgery at this time is subjective complaints. So what about this EMG ticket on December 30th, 2012, two months after the accident? Doesn't it demonstrate mild chronic? At 2010? Yeah. Okay. Isn't that some support? Well, it's only a couple months later. And I can't recall in this instance, but I know that doctors have testified that you don't really see changes on EMG until three to four months have gone by. This is a chronic condition, and you can't tell the chronicity of the complaints on that EMG. He's had radicular complaints for the better part of a decade prior to this accident. And yet there was no question he wasn't off work until September 23rd, 2010, right? Correct. Let me ask you this, a very one-pointed question. Why couldn't the Commission, as they did, adopt the opinion of Zinderich over Kornblatt and you say, well, Kornblatt is the only one who studied all the claimant's records. Obviously, that argument was made below before the arbitrator and the Commission. They didn't buy it then. They ruled in favor of Zinderich's opinion. Correct? Correct. So what under the law prevents them from doing that? Well, I believe that their decision is against the manifest weight of the evidence. They've not looked at it. They've disregarded the only physician's opinion who reviewed all of the medical records. But don't they assess, is it up to them to assess the expertise, the weight of the evidence, the credibility of the doctors? Isn't that up to them to do? Well, I agree. But when their decision is, or their conclusion, excuse me, is against the manifest weight of the evidence, when it flies in the face of logic, as we believe this one does, it is the Court's obligation to step in. Take me simply through that, how it defies logic. You have Dr. Zinderich, the Petitioner's, the employee's IME physician, who has not reviewed all of the records, who has concluded somehow that there's an aggravation when there's no change on MRI testing from 2002 to 2010. He recommends surgery that was recommended back in 2002. There's no change in the man's condition from the employee's standpoint. It continues to be, I need surgery. And he didn't have it in 2002. He hasn't had it in subsequent to 2010 as well. Again, he's gone back to work. The record reflects that he's back to work doing his normal job from March of 2011 until he testified in November of 2011. Again, it's all the same pattern as the prior claim. So you're saying that because there's radiculopathy back in 2002, and there consistently has been radiculopathy, that there has been no aggravation or, if anything, a temporary exacerbation? No, I agree there's been a temporary aggravation, an exacerbation, if you will. We paid benefits. We paid roughly six months of TTD benefits. We paid for the medical. Our contention is he is back to his baseline where he was on September 22, 2010, the day before the accident, by the end of February 2011, when he had the functional capacity evaluation and work conditioning. That's how he could go back to his job. Counsel, let me ask you this. You acknowledged, did you not, that the December 30, 2010 EMG, you acknowledged that. You're insisting it's merely a revealed and normal progression of Clayman's condition, not affected in any way by Clayman's accident of September 23, 2010. That's your argument. What medical evidence or testimony supports that interpretation? Well, he continued to have, well, he had radiculopathy prior to the accident. He had radiculopathy which was demonstrated by the subsequent EMG prior to the accident. Right. There's nothing of record that shows that that positive EMG is as a result of his September 23, 2010 work accident. It's a progression that dates back to his accident. That's based on your interpretation of the medical evidence. I believe so, yes. But I believe it's also consistent with Dr. Kornblatt's reading of the records. Dr. Kornblatt indicated his opinion that the condition was longstanding, degenerative and would progress. Regardless of the work activity, he had a cervical strain, and he recovered from that within approximately six months and was able to do his regular job. What about the TTD? Well, he had no treatment after February 28, 2011. That was the date that he was allowed to go back to work in an unrestricted capacity. There's a month gap in between that time. There's testimony he needed to get a full-duty work slip, but there's no reason he couldn't have been back to work after he was told on February 28 that he's able to go back to work. I mean, there's no change, no improvement in those three, four weeks afterwards to merit an award of TTD. And as far as the future medical, again, he went back to work. He's doing his job. You said he couldn't go back to work. Your company would not allow him to return to work on modified duty, would you? He was allowed back full duty. Right, but he had restrictions, according to Kornblatt's release, didn't he? I don't believe so. I don't. No, I think Dr. Kornblatt's release was subject to restrictions. I think you need to check that. If they were, I think they were of the FCE. No? Well, wasn't your claim instructed by the supervisor to obtain a full-duty release from the treating physician? Don't you remember that? I do remember that, but the treating physician was Dr. Salehi. I don't know why the employer instructed him to go back to Salehi. Okay. He returned to work. He does his regular job. He testified that sometimes he does not. The employer is unaware of that. His co-worker testified that he does a lot of the job. However, when the co-worker is on vacation, the petitioner did his regular job duties. He's not gone back for medical care from March of 2011 until November of 2011. He did not voice any complaints to the employer during that time. Again, consistent with our position that he had returned to his baseline, did not require the surgery. Wasn't his co-worker doing all the lifting? That's what the co-worker testified to. It was unknown to the employer. Okay. Well, why can't the commission consider the co-worker's testimony? They can certainly believe him, can't they? Certainly they can. But if we leave that equation that everything is normal, if somebody else is doing the guy's job for him, how can we say everything is normal? Well, he was doing the job without our knowledge. The co-worker was doing his work without our knowledge. Yeah, but that's a separate issue. You're talking about you make the representation that the guy is fine, everything is back to normal, he's doing his normal job. He's really not doing his normal job. Is he when one guy on the shift on the beer truck is doing all the lifting? However, when that person went on vacation and he was assigned to someone else who refused to do his work, the employee did his work. Apparently without issue. I understand. And didn't, you know, so whatever the two guys have worked out on the truck, I can't, you know, the co-workers. I would call on the commission to assess. Agreed. When do you say they should have entered the TTD? At what date? February 28, 2011. Well, in February 28, 2011, no one had yet released him to full duty, had they? I believe he was allowed to go back with his, based upon the work conditioning evaluation. Work within restrictions. Then Kornblatt issues an addendum on March the 18th, which says that he was capable of returning to work on February 28th. Again, within his restrictions. And a week later, Kornblatt offers another amendment indicating that he reached MMI on February the 28th. And he testifies that his lawyer told him that on or about February 25th, Kornblatt had released him to work within his restrictions. He wasn't even aware that Kornblatt authorized him to return to work on February 28th, was he? That I can't answer as I stand before you. Until sometime in March. And my indication from the record is that your people would not let him return to work under light duty or modified duty. You told him a clean release, or you don't come back? Well, again, if he's at MMI, DTD cannot accrue after that date. As an abstract principle, how do you determine whether he's at MMI? You look to the doctor's reports, don't you? Correct. What's the day that Dr. Salady released him to return to work? It was March the 30th. That sounds about right. I was going to say the 25th without knowing the date. And they ordered the DTD to run through March the 29th. All right. Thank you. Thank you, counsel. You'll have time to reply. Counsel, you may proceed. Please, the court. Counsel Dave Kosen, on behalf of the appellee and defendant, Mr. Williamson, I agree, contrary to what respondent initially put in their brief, that it was that the questions before this court are matters of law and contrary to the manifest weight. I agree with counsel's assertion here, and obviously what the court agrees, that this is a question of manifest weight. The decision of the commission is obviously well-founded on all the facts, and I know that you've tried to reach the head of the situation and say this is really an argument between Dr. Kornblatt on behalf of the employer and Dr. Zindrick on behalf of the petitioner. And it is the purview of the commission to draw inferences from that evidence and to make a conclusion. Not only is it well-founded, the conclusion that they draw is absolutely the correct one. Beyond that, though, every issue that the respondent raises in its brief is a factual matter that the commission dealt with in detail. They understand that this man does a heavy-duty job moving 25 to 28-pound cases of beer from heights of 10 feet high 800 times a day during his 24-year career with these people. And if you do the short calculation, that's close to 8 to 10 tons per day that he handles moving this product. This man has never hidden the fact that since 1990 he's had complaints to his neck and shoulder the commission is also aware of the fact that during this entire time this gentleman has never taken time off work and he's never required any modification of his job whatsoever. The commission is well aware of the fact of his previous case which occurred in 1998 and that there was a claim to proceed with surgery at that time. The case was tried and surgery was denied by the commission. The commission is also aware of the fact that throughout that case this gentleman never took a day off work, the earlier case, nor did he require any modification. The commission is also aware that in the impending period after that, up until our accident September 23rd of 2010, that this gentleman did have continuing complaints to his neck and shoulder, that he was able to perform the full function and duty of his job without taking time off or requiring modification. That's the gentleman that the commission, in our case, was presented with as a factual matter. And counsel would agree that on September 23rd, 2010, there was a stipulated accident. There's been no other evidence than supplied by the petitioner that when he had that accident pulling down the door of the truck, the delivery truck, that the pain that he felt in his neck and his shoulder was worse than he had ever felt before. The commission was also aware that immediately thereafter, I believe the next day, this gentleman did have to go off of work because he was given restrictions by the Respondent's Occupational Clinic. And you're also well aware of the fact that it is the company's unrebutted position that if you have any restriction, you cannot come work for us, period. There's no late duty. The company's clinic sends this gentleman over to Dr. Salehi, a neurosurgeon. Dr. Salehi does another MRI. Dr. Salehi does the second EMG, which can be compared to the one that happened on February 14th. What does that show? The new EMG does show that there is a radicular component that this gentleman has documented now at C5, C6. So there is a quantitative change from the EMG that occurred at the time of his injury in 1998. I believe the EMG happened, obviously, about a year or so later. But after the point in time of our accident, there is now a documented radicular problem. That supports the finding of his injury. It's objective medical evidence. Yes. And it also questions the final conclusion of Dr. Kornblatt, who when he writes his third report, actually the fourth report, this is the third one he didn't take the opportunity to examine the petitioner, the one that he wrote right before trial, when Dr. Kornblatt said that, well, this is obviously not a surgical lesion because if it were, there would be evidence of radiculopathy. If you look at that report, he doesn't mention EMG in there at all. He did not have the relevant medical. And that is one of the major reasons that the commission found that Dr. Zinderich was the most credible medical opinion in this case. What's your position on TTD? You've heard his argument. Well, if TTD stops when a person reaches, in principle, when a person reaches permanency and has MMI, if you discount Dr. Kornblatt, which you have to do, this man never reached MMI. In fact, Dr. Kornblatt never, contrary to what counsel may know about his doctor or remember, Dr. Kornblatt keeps this gentleman under restrictions the entire time. But that's different than reaching MMI. The fact that somebody is under restrictions does not necessarily mean they haven't reached MMI. So the opinion that we're looking at is, did this man reach a state of MMI? And what I'm saying is that the commission was right in saying that this man has not, that this man needs to have surgery. Well, here, let's try and divide these two things up. They didn't terminate his TTD for any reason, really, other than Kornblatt's opinion that he had reached MMI. Right. At the time Kornblatt said that he had reached MMI, you had Salehi, Paul, and Zindrick all recommending that he be authorized to have an anterior cervical fusion, which they've testified is causally related to his underlying injury. So it occurs to me that you have evidence of three doctors suggesting he's certainly not at MMI, and you've got Kornblatt's opinion saying he is at MMI, which makes it nothing more than a conflict of medical opinions. Correct. And under O'Dette. Absolutely. What I'm saying is – I'm sorry. No, go ahead. What I'm saying is that if you do not accept, as the commission did not, the final opinions of Dr. Kornblatt, who I will point out did not use the term MMI until March 25th at the time of another report that he never examined the petitioner for, that there is no MMI. This gentleman does need the surgical procedure. So at the time that Dr. Kornblatt on March 25th renders his MMI opinion, it has to be weighed with the fact that he still has not returned this man to full duty. He still has restrictions, which the petitioner never had through any of his own doctors prior to September 23rd, 2010. So Dr. Kornblatt is now saying, take it easy, go back to work, there's a problem going on here. However, I think you're at MMI and it was only a temporary exacerbation. It makes no sense. That's why the opinion of Dr. Kornblatt was dismissed. What about the prospective medical findings? Respondents arguing that the commission's decision to award the claimant prospective medical treatment is also against the manifest way of the evidence. Well, again, the only evidence that counsel can point to or the respondent can point to, is that they have this opinion of Dr. Kornblatt who says it's not necessary. And Dr. Kornblatt's opinion weighed thoroughly by the commission compared to what he was saying, compared to what he was concluding, and then weighing it against the opinions of Dr. Zindrick, Dr. Ron John Paul, and Dr. Salehi, that Dr. Kornblatt's opinion does not hold weight. Therefore, they found that the weight of the evidence proved the fact that this gentleman needs his three-level fusion. That is their purview. That is what they're charged to do. There is not only sufficient evidence to sustain that, but I would submit to you that it is the only true conclusion that can be drawn from the facts. Thank you. Thank you, counsel. Counsel, you may reply. I do want to point out, Mr. Justice Hudson, I did find in the record, and the record does indicate on February 28th he did have restrictions. They were sufficient for him to do his regular job. They were 100 pounds, appearing 100 pounds. So that was my, why I concluded he could do his full-duty job. But I do see that they did put a limit on him. As to what Mr. Kozin brought up, I would again urge that this Court look at the prior records, the recommendation for surgery that was had, the fact that he didn't have it when he, back then, even when group insurance could have covered it then, the fact that he's back to work doing a heavy job, even with some help, militates against the award of future medical. Thank you. Thank you, Mr. Egan. Mr. Kozin, thank you both for your arguments in this matter. It would be taken under advisement that this position shall issue.